UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Jacqueline Reynolds,

    Plaintiff,

    v.                                                           Civil Action No. 2:18–cv–226-jmc

Elizabeth Demas, Esq.,
Bruce D. Baker, Esq.,

    Defendants.

## **OPINION AND ORDER**
(Docs. 30, 47, 54, 56, 57, & 65)

On January 9, 2019, proceeding *pro se*, Plaintiff Jacqueline Reynolds filed an Amended Complaint in the present civil action, alleging that Defendants Elizabeth Demas, Esq., and Bruce D. Baker, Esq., committed professional legal malpractice in multiple ways. (Doc. 3 at 11–25, ¶¶ 25–73.) The gravamen of these claims is that Attorneys Demas and Baker committed legal malpractice in their representation of Reynolds in a partition action brought against Jane Scanlon in Vermont Superior Court. (*Id.*) Reynolds seeks total damages in excess of $800,000, including expenses, and 12% interest from 2006 to 2015. (*Id.* at 25–26, ¶¶ 75–76.)

Presently before the Court is Demas and Baker's Motion for Summary Judgment (Doc. 30) and several other pending motions submitted by both parties. (*See* Docs. 47, 54, 56, 57, 65.) Oral argument was held on September 16, 2019. For the reasons set forth below, Demas and Baker's Motion for Summary Judgment

(Doc. 30) is GRANTED, and Reynolds's motions to extend time to retain an expert (Docs. 47, 65) are DENIED. Further, because the Court grants the Motion for Summary Judgment, the pending motions filed after the summary judgment motion are DENIED as moot. (Docs. 54, 56, 57.)

## **Factual Background**

The material facts are primarily drawn from Reynolds's Amended Complaint (Doc. 3), the documents Reynolds submitted with her Amended Complaint (Docs. 3-1–3-52), and the documents filed by Demas and Baker in support of their Motion for Summary Judgment. (Docs. 30-1–30-9.) They are undisputed unless otherwise indicated.

## I. Reynolds's Loans to Jane Scanlon

Reynolds met Jane Scanlon online sometime in February 2006. (Doc. 3 at 3, ¶ 13.) At the time, Reynolds lived in Texas and Scanlon lived in Vermont. (*See* Doc. 3-8 at 3, ¶¶ 13–14.) Apparently, after Reynolds and Scanlon met, Reynolds began traveling from Texas to stay with Scanlon in Vermont. (*Id.*)

Approximately three months after they met, Reynolds allegedly loaned Scanlon $1,000. (Doc. 3. at 3, ¶ 13.) About a month later, Reynolds and Scanlon discussed forming a joint business to rent the rooms of Scanlon's house, located at 21 Messenger Street in St. Albans, Vermont. (*Id.* ¶ 14.) Scanlon conducted preliminary research to determine whether such a business would be a good investment. (*Id.*) Unbeknownst to Reynolds, however, the Franklin County Vermont Superior Court had previously issued an order on October 4, 2005

appointing an agent to sell the property at 21 Messenger Street and to apportion the proceeds between Scanlon and her ex-husband in accordance with their divorce decree. (Doc. 3-5.)

According to Reynolds, it was not until several months later that Scanlon told Reynolds that Scanlon owed her ex-husband approximately $15,000 and that the Franklin County Superior Court had ordered the sale of 21 Messenger Street to satisfy the debt. (Doc. 3 at 4, ¶ 16.) In August 2006 (Doc. 3-8 at 3, ¶ 15), to prevent the sale of 21 Messenger Street, Reynolds agreed to loan nearly $16,600 to Scanlon to satisfy the debt, as well as the interest that had accrued and the fees due to the agent tasked with selling the property.[1] (Doc. 3 at 5–6, ¶¶ 16–17; *see also* Doc. 3-7.) Subsequently, Reynolds claims that she provided Scanlon with an additional check for $3,500 in full satisfaction of the remaining claims against Scanlon. (*Id.*; *see also* Doc. 3-9.) In total, Reynolds asserts that she "loaned Ms. Scanlon over ($20,000.00) regarding the divorce decree settlement of Ms. Scanlon and her former husband." (Doc. 3 at 5–6, ¶ 17.) To secure this loan, Reynolds and Scanlon executed a promissory note for $22,000 on August 8, 2006 (Promissory Note A). (*See* Doc. 3-11 at 5.) Under the terms of Promissory Note A, Scanlon agreed to a 7% interest rate on the loan, with the entire amount due on October 8, 2006. (*Id.*) If the funds were not available on October 8, Scanlon agreed to sell the property at 21 Messenger Street to pay the outstanding loan. (*Id.*)

---

[1] For that purpose, Reynolds provided Scanlon with two checks of $8,300. (Doc. 3 at 5–6, ¶ 17.)

3

Apparently, sometime after Reynolds made these loans, she and Scanlon entered into a verbal business agreement to rent rooms at 21 Messenger Street. (Doc. 3 at 6–7, ¶ 18.) Reynolds agreed to provide money to repair and update the property for guests and Scanlon was designated to collect rental payments; Reynolds and Scanlon also decided to split the rental payments equally and to reinvest the rental payments into the property where required. (*Id.*) As part of their discussion, Scanlon also agreed to execute a quitclaim deed giving Reynolds a 50% interest in 21 Messenger Street. (*Id.*) Reynolds states that she fulfilled her monetary obligations under the agreement and, by December 2006, Scanlon had found a renter for 21 Messenger Street. (*Id.* at 8–9, ¶ 22.) On April 19, 2007, Scanlon fulfilled her portion of the agreement by executing a quitclaim deed providing Reynolds with a 50% interest in 21 Messenger Street. (*Id.*; *see also* Doc. 3-11 at 7–8.)

At the same time that Reynolds and Scanlon were engaged in their business venture, Reynolds states that she provided Scanlon with two additional personal loans. First, on October 24, 2006, Reynolds loaned Scanlon $24,500. (Doc. 3 at 7, ¶ 20.) Then, in approximately March 2007, Reynolds loaned Scanlon an additional $31,500. (*Id.* at 7–8, ¶ 21.) Reynolds maintains that both payments were personal loans to Scanlon and were not financial contributions to the rental business at 21 Messenger Street. (*Id.* at 7–8, ¶¶ 20–21.) To secure payment for these loans, Reynolds and Scanlon signed a second promissory note (Promissory Note B) on

4

April 19, 2007.² (*Id.* at 8, ¶ 21; *see also* Doc. 3-11 at 6.) Under the terms of Promissory Note B, Scanlon agreed to a 7% interest rate on the loan, with the entire amount due that fall, specifically on October 8, 2007. (*See* Doc. 3-11 at 6.) If the funds were not available on October 8, Scanlon again agreed to sell the property at 21 Messenger Street to pay the outstanding loan. (*Id.*)

From summer 2008 to spring 2012, Reynolds apparently attempted to informally recover the amounts loaned to Scanlon, but Scanlon failed to repay the loans. (Doc. 3 at 9, ¶ 23.) Then, in May 2013, Reynolds contacted a realtor in Vermont to ask about the possibility of selling 21 Messenger Street, apparently so that she could recover the loan amounts and rental income. (*Id.* at 9–10, ¶ 24.) Ultimately, the realtor suggested that Reynolds contact Attorney Demas for advice regarding the possible sale of 21 Messenger Street and about the loan obligations owed by Scanlon. (*Id.*)

## II. Demas's Representation of Reynolds

In July 2013, Reynolds hired Attorney Demas to seek partition of 21 Messenger Street, to recover 50% of any unpaid rental income held by Scanlon, and to seek repayment of the outstanding loans provided to Scanlon. (Doc. 3 at 11–13, ¶ 27.) From the beginning, however, Attorney Demas recommended that Reynolds attempt to settle the case, because "the court process to quiet this title, or

---

² As discussed above, April 19 is the same day Scanlon executed the quitclaim deed providing Reynolds with a 50% interest in 21 Messenger Street. (Doc. 3 at 8–9, ¶ 22; *see also* Doc. 3-11 at 7–8.)

5

partition the property, could take years, would cost thousands of dollars, and may well end up with you back at the point of only owning half of the property." (Doc. 3-52.)

Subsequently, in October 2013, on behalf of Reynolds, Attorney Demas filed a complaint against Scanlon in the Franklin County Superior Court. (*See* Doc. 3-11.) In the complaint, Demas asked the superior court to partition the property at 21 Messenger Street so that Reynolds could recover $94,625.20 purportedly owed by Scanlon and so that Reynolds could be awarded an undivided 50% interest in the property. (*Id.* at 1, ¶ 4.) With regard to the amount demanded, Demas alleged in the complaint that Reynolds advanced Scanlon a total of $101,625.20 between February 2006 and March 2012 and that Reynolds had repaid only $7,000 of that amount. (*Id.* at 1, ¶ 5.) For support, Demas attached Promissory Note A, alleging that the note reflected a debt of $35,500, and Promissory Note B, which purportedly represented a debt of $66,125.20. (*Id.* at 2, ¶¶ 6–7.) But the sums set forth in the attached promissory notes did not match the sums demanded in the complaint;[3] instead, as described in detail above, Promissory Note A secured a loan of $22,000 and Promissory Note B secured a loan of $56,000. (*See id.* at 5–6.)

---

[3] It is unclear how Attorney Demas arrived at the sums demanded in the complaint. Although it is possible that Attorney Demas calculated the sums by applying the 7% interest rate set forth in both promissory notes (*see* Doc. 3-11 at 5–6), calculating the compound interest using 7% does not equal the sums sought in the complaint. Similarly, although Demas appears to claim in her Motion for Summary Judgment that Reynolds provided Demas with additional checks that Reynolds had written to Scanlon (Doc. 30 at 4), the complaint neither made mention of these additional checks nor attached these purported checks. (*See generally* Doc. 3-11.)

6

After filing the complaint, Attorney Demas emailed Reynolds to let her know the next steps in the process. (*See* Doc. 3-26 at 4.) In her email, Demas expressed her hope that the complaint "would generate settlement discussions." (*Id.*) Demas also explained that she would "try to get as much money for [Reynolds] as possible in court, and the judge can award as much as we can document [that Scanlon] borrowed." (*Id.*)

In December 2013, Scanlon filed an answer and counterclaim, alleging that both Promissory Note B and the quitclaim deed were frauds. (Doc. 3-8 at 1–2, ¶ 7; *id.* at 3–5, ¶¶ 19, 21–28.) With regard to Promissory Note A, Scanlon admitted that Reynolds advanced Scanlon $16,000 to help finalize Scanlon's divorce and that Scanlon subsequently executed Promissory Note A. (*Id.* at 3, ¶¶ 15–18.)

On January 8, 2014, Attorney Demas forwarded the answer and counterclaim to Reynolds, noting that Scanlon's allegations were "serious," and on February 10, 2014, she requested that Reynolds provide the original versions of the promissory notes to rebut the claims of fraud.[4] (*See* Doc. 3-27; Doc. 3-28.) Later that month, Reynolds provided Attorney Demas with the originals of the quitclaim deed and Promissory Note A, but did not produce an original version of Promissory Note B. (*See* Doc. 3-27; *see also* Doc. 30-1 at 5, ¶ 22.)

Scheduling discovery and pretrial matters then became difficult for the parties. (*See* Doc. 3-42.) Eventually, in early November 2014, Demas and Scanlon's

---

[4] A subsequent analysis by a handwriting expert concluded that Promissory Note B was a fraud, "because the notary section of the Quitclaim Deed has been cut and pasted onto the bottom half of . . . Promissory Note [B]." (Doc. 3-14 at 2.) At the time, however, Attorney Demas did not have this information when she concluded that Scanlon's counterclaims were serious.

7

attorney agreed to schedule depositions and to mediate the case. (Doc. 3-39.) To prepare for the depositions and mediation, a paralegal from Attorney Demas's office offered to explain the process to Reynolds, but the extent of their conversation is unclear from the record before this Court. (Doc. 30-3 at 6 (pp. 33, 34); Doc. 30-5.)

Ultimately, the mediation resulted in a settlement agreement that both Reynolds and Scanlon signed in February 2015. (*See* Doc. 3-41.) In the agreement, Scanlon and Reynolds agreed that the 2007 quitclaim deed validly conveyed a 50% interest in 21 Messenger Street to Reynolds. (*Id*. at 1, ¶ 2.) Scanlon also agreed to refinance 21 Messenger Street within 90 days and to pay Reynolds $62,500 from the proceeds of the refinancing. (*Id*. ¶ 3.) If Scanlon defaulted on the agreement, the agreement authorized the superior court to enter final judgment in favor of Reynolds and to appoint a special master to sell 21 Messenger Street. (*Id*. at 2, ¶ 5.) On March 17, 2015, the Franklin County Superior Court entered an order incorporating the terms of the settlement agreement. (*See* Doc. 3-44.)

After the superior court entered the March 2015 Order, and before Reynolds received any settlement money, Attorney Demas withdrew as Reynolds's counsel on May 1, 2015. (Doc. 30-6.) Demas asserts that she withdrew as counsel at Reynolds's behest. (*Id*.; Doc. 30-1 at 6, ¶ 27.)

Scanlon did not honor the obligations set forth in the March 2015 Order.

Reynolds subsequently attempted to enforce the settlement agreement and March 2015 Order in a *pro se* capacity. On September 15, 2015, seeking information regarding enforcement of the agreement, Reynolds emailed the

mediator who she believed had mediated the agreement (Doc. 3-45); unfortunately, Reynolds did not email the correct mediator and instead contacted a different mediator who belonged to the same law firm. (*See* Doc. 3-46.) It was not until October 26, 2017 that Reynolds received a reply from the mediator who had actually mediated the settlement agreement. (*Id*.) The correct mediator suggested that Reynolds contact Demas for information regarding the settlement agreement. (*Id*.)

In the meantime, in October 2016, Reynolds filed a complaint against Demas with the Vermont Professional Responsibility Program. (*See* Doc. 30-1 at 6, ¶ 30; *see also* Doc. 30-8.) On November 14, 2016, Bar Counsel for the Professional Responsibility Program dismissed Reynolds's complaint, concluding that "the facts suggest that [Attorney Demas] provided [Reynolds] with competent and diligent representation that resulted in a favorable settlement." (Doc. 30-8 at 3.) Specifically, Bar Counsel noted that there was some question whether the notary sections of the promissory notes "had been tampered with" and that "[t]his issue tended to cut against [Reynolds] and, had the case gone to trial, might have reduced [her] likelihood of prevailing." (*Id*.)

Then, in June 2018, Reynolds filed a *pro se* "Motion of Contempt" in Franklin County Superior Court seeking enforcement of the March 2015 Order. (Doc. 30-7; *see also* Doc. 3 at 21, ¶ 63.) In her "Motion of Contempt," Reynolds stated that Scanlon failed to refinance 21 Messenger Street within 90 days of the March 2015 Order and, as a result, a special master should be appointed to sell 21 Messenger Street. (Doc. 30-7.) According to Reynolds, the superior court did not consider her

9

contempt motion because "Scanlon was not served with a copy of the [March 2015] Order," but the court stated that it would reschedule the matter once Scanlon was properly served. (Doc. 3 at 21–22, ¶¶ 64–65.) Apparently, this contempt motion is still pending (Doc. 30 at 6) and Reynolds informed the Court at the September 16, 2019 hearing that she has hired new counsel in that action.

## III. Procedural Background

Reynolds filed the initial Complaint in the pending action on December 13, 2018 (Doc. 1), and the Amended Complaint on January 9, 2019. (Doc. 3.) In her Amended Complaint, Reynolds asserts that Attorneys Demas and Baker committed professional malpractice in six overlapping ways: (1) by inadequately evaluating the sums owed by Scanlon on the personal loans advanced by Reynolds, the amount owed by Scanlon from rental income, and the 50% interest that Reynolds held in 21 Messenger Street (*id.* at 11–13, ¶¶ 25–27); (2) by incorrectly calculating Scanlon's monetary obligations in the complaint and by improperly investigating Scanlon's counterclaims (*id.* at 13–18, ¶¶ 28–41); (3) by failing to obtain the necessary documents and secure essential witnesses (*id.* at 18–19, ¶¶ 42–47); (4) by neglecting to obtain Reynolds's consent to mediate and to enter into the settlement agreement (*id.* at 19, ¶¶ 48–52); (5) by inadequately negotiating and advocating on Reynolds's behalf (*id.* at 19–22, ¶¶ 53–66); and (6) by incompetently advising and communicating with Reynolds (*id.* at 22–24, ¶¶ 67–69). As a result of the purported legal malpractice, Reynolds seeks $818,000 in damages with 12% interest, as well as $4,500 in attorneys' fees. (*Id.* at 25–26, ¶¶ 75–76.)

On May 13, 2019, Attorneys Demas and Baker filed the pending Summary Judgment Motion, asserting first that Reynolds's claims against Baker are specious because Baker never represented Reynolds. (Doc. 30 at 1.) With regard to Demas's representation, Demas claims that she provided adequate legal assistance and that Reynolds willingly signed the settlement agreement. (*Id.* at 2.) Finally, Attorney Demas argues that Reynolds's claims should be dismissed because Reynolds has failed to provide an expert witness to support her professional malpractice claims, as required by Vermont law. (*Id.*)

In response, Reynolds asserts that expert testimony is not required in this case because Demas and Baker's professional misconduct was so egregious as to be obvious to a layperson. (Doc. 35 at 20–21; *see also* Doc. 57.) Alternatively, Reynolds requests an extension of time to retain an expert witness. (Docs. 47, 65.)

## Analysis

### I. Summary Judgment Standard

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine dispute as to any material fact" exists when factual issues materially affecting the outcome could reasonably be resolved in favor of either party. *See McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999). In other words, "[t]he moving party is entitled to summary judgment where 'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor' on an essential

element of a claim on which the plaintiff bears the burden of proof." *Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 22 (2d Cir. 2012) (quoting *In re Omnicom Grp., Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010)).

In conducting this analysis, if there is a genuine dispute regarding the material facts, those facts "must be viewed in the light most favorable to the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Although the Court accepts as true a nonmoving party's allegations that are supported by admissible evidence, and also gives the nonmoving party the benefit of all reasonable doubts and inferences, a nonmoving party's "mere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). If no genuine issue of material fact exists and the nonmoving party has had an adequate opportunity to address the issues involved by developing facts necessary to oppose summary judgment, summary judgment is proper. Fed. R. Civ. P. 56(e).

Because Reynolds is proceeding *pro se*, the Court must read her pleadings liberally and interpret them "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Still, Reynolds's *pro se* status does not exempt her from the summary judgment requirements; she cannot rely on mere conclusory allegations, because speculation or conjecture will not avail a party resisting summary judgment. *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996).

## II. Legal Malpractice Claim

### A. Legal Standard

Because federal subject-matter jurisdiction in this case is based on diversity of citizenship, the Court must employ the substantive law adopted by Vermont, the forum state. *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005) ("In a diversity case we apply the substantive law of the forum state[.]"). Under Vermont law, a plaintiff advancing a legal malpractice suit "must prove that the attorney was in fact negligent and that this negligence was the proximate cause of the plaintiff's injury." *Estate of Fleming v. Nicholson*, 168 Vt. 495, 497, 724 A.2d 1026, 1028 (1998). To establish causation, "a plaintiff must prove it is more likely than not that, but for the attorney's negligent conduct, the plaintiff would not have been harmed."[5] *Sachs v. Downs Rachlin Martin PLLC*, 2017 VT 100, ¶ 19, 206 Vt. 157, 179 A.3d 182. "Generally, negligence by professionals is demonstrated using expert testimony to: (1) describe the proper standard of skill and care for that profession, (2) show that the defendant's conduct departed from that standard of care, and (3) show that this conduct was the proximate cause of plaintiff's harm." *Estate of Fleming*, 168 Vt. at 497, 724 A.2d at 1028. "If the alleged negligent conduct is a matter of judgment unique to that profession, the above elements must be established by expert testimony to assist the trier of fact in determining

---

[5] In the specialized field of legal malpractice, the Vermont Supreme Court has "emphasized that an element of proximate cause in lawyer malpractice actions is cause-in-fact." *Sachs v. Downs Rachlin Martin PLLC*, 2017 VT 100, ¶ 19 n.3, 206 Vt. 157, 179 A.3d 182 (2017) (quoting *Roberts v. Chimileski*, 2003 VT 10, ¶ 15, 175 Vt. 480, 820 A.2d 995 (mem.)) (internal quotation marks omitted). But to the degree that the Vermont Supreme Court "has merged the proximate cause inquiry with the cause-in-fact inquiry for legal malpractice claims, . . . the meshing of the two inquiries does not extend outside of attorney malpractice." *Id.*

13

negligence." *Id*. But if "a professional's lack of care is so apparent that only common knowledge and experience are needed to comprehend it, expert testimony is not required to assist the trier of fact in finding the elements of negligence." *Id*. at 497–98, 724 A.2d at 1028.

### A. Claims Against Baker

As an initial matter, nothing in Reynolds's allegations or in the evidence submitted in support of her Amended Complaint suggests that Attorney Baker provided any legal assistance to Reynolds. (*See generally* Doc. 3.) Indeed, in a deposition given in the present case, Reynolds conceded that she did not have any contact with Attorney Baker. (Doc. 30-3 at 4 (pp 14, 15).) According to Reynolds, Baker was named because he is the registered agent of the law firm Clarke, Demas & Baker. (*Id.*; Doc. 35 at 16–17.) Although Demas is a founding partner, the law firm itself is not a named defendant in this action. Even if it were, the person designated as the registered agent for purposes of service of process need not be named as a party to the suit. *See McLemore v. Dennis Dillon Auto. Grp., Inc.*, No. 1:12-cv-00569-MHW, 2013 WL 97767, at *2 (D. Idaho Jan. 8, 2013) (Williams, Mag. J.) (a registered agent "should not be named as a Defendant"). Accordingly, given the complete lack of evidence of Baker's involvement in this matter, a reasonable juror could not infer that Attorney Baker committed legal malpractice.

### B. Claims Against Demas

Next, viewing the evidence in the light most favorable to Reynolds, the Court concludes that Reynolds has failed to provide sufficient evidence for a reasonable

juror to infer that Demas's alleged negligence caused Reynolds harm. Accordingly, Reynolds's claims against Demas cannot survive summary judgment.

As discussed above, because Reynolds has failed to offer expert testimony to support her Amended Complaint, she must establish that a reasonable juror could infer based on common knowledge and experience that Demas was negligent. *See Estate of Fleming*, 168 Vt. at 497–98, 724 A.2d at 1028. But the record does not support such an inference, because the evidence does not show that Demas's purportedly negligent acts caused Reynolds harm. *See id.* at 497 (stating causation is an essential element of professional malpractice); *see also Sachs*, 2017 VT 100, ¶ 19.

For example, regarding Reynolds's first claim, even if jurors were to concluded that Demas overstated the sums owed to Reynolds by Scanlon (Doc. 3 at 11–13, ¶¶ 25–27), nothing in the record suggests that Reynolds was harmed by this alleged overstatement. When Demas filed the complaint in Franklin County Superior Court, Demas asked the court to partition the property at 21 Messenger Street so that Reynolds could recover $94,625.20 purportedly owed by Scanlon and so that Reynolds could be awarded an undivided 50% interest in the property. (Doc. 3-11 at 1, ¶ 4.) Demas supported her claims on behalf of Reynolds with copies of the quitclaim deed, Promissory Note A, which secured $22,000, and Promissory Note B, which totaled $56,000. (*Id.* at 5–8.) When Scanlon's attorneys counterclaimed and asserted that both Promissory Note B and the quitclaim deed were fraudulent (Doc. 3-8 at 1–2, ¶ 7; *id.* at 3–5, ¶¶ 19, 21–28), Demas asked

15

Reynolds for the originals and Reynolds only provided Demas with Promissory Note A and the quitclaim deed. (*See* Doc. 3-27; *see also* Doc. 30-1 at 5, ¶ 22.) Despite this lack of evidentiary support, Demas negotiated a settlement agreement that awarded Reynolds $62,500 either from refinancing Scanlon's interest in 21 Messenger Street or, if the refinancing did not occur, from a court-ordered sale of the property. (Doc. 3-41 at 1, ¶¶ 2–3.) In other words, the record shows that, rather than causing harm, Reynolds benefited from Demas's representation because Reynolds received a greater award than that supported by the available, credible evidence.[6] A reasonable juror could not rely on common knowledge to conclude that this was negligent.

Reynolds's other allegations of professional malpractice also fail for the same reason.[7] In particular, even if a reasonable juror could conclude that Demas neglected to obtain Reynolds's consent to mediate and to enter into the settlement

---

[6] In fact, as noted above, subsequent analysis by a handwriting expert concluded that Promissory Note B was a fraud, "because the notary section of the Quitclaim Deed has been cut and pasted onto the bottom half of . . . Promissory Note [B]." (Doc. 3-14 at 2.) Although Attorney Demas did not have this information when she concluded that Scanlon's counterclaims were serious, this information provides additional evidence that Demas achieved a favorable result for Reynolds.

[7] As a reminder, those claims are as follows: (1) inadequately evaluating the sums owed by Scanlon on the personal loans advanced by Reynolds, the amount owed by Scanlon from rental income, and the 50% interest that Reynolds held in 21 Messenger Street (Doc. 3 at 11–13, ¶¶ 25–27); (2) incorrectly calculating Scanlon's monetary obligations in the complaint and by improperly investigating Scanlon's counterclaims (*id*. at 13–18, ¶¶ 28–41); (3) failing to obtain the necessary documents and secure essential witnesses (*id*. at 18–19, ¶¶ 42–47); (4) neglecting to obtain Reynolds's consent to mediate and to enter into the settlement agreement (*id*. at 19, ¶¶ 48–52); (5) inadequately negotiating and advocating on Reynolds's behalf (*id*. at 19–22, ¶¶ 53–66); and (6) incompetently advising and communicating with Reynolds (*id*. at 22–24, ¶¶ 67–69). As discussed, none of these allegations are supported by sufficient evidence for a reasonable juror to conclude based on common knowledge and experience that Demas's purportedly negligent acts caused Reynolds harm.

agreement[8] (Doc. 3 at 19–22, ¶¶ 48–66), nothing in the record suggests that Reynolds was harmed by the mediation and settlement agreement.  Indeed, Reynolds does not dispute that she signed the settlement agreement and that she is currently attempting to enforce the court order incorporating the agreement.  (*See* Doc. 3-41; *see also* Doc. 3 at 21–22, ¶¶ 63–65.)  Although Reynolds claims that she did not understand the settlement agreement, she points to no contemporaneous evidence suggesting that she misunderstood the agreement.  Moreover, as discussed above, Scanlon credibly claimed in her counterclaim that Promissory Note B and the quitclaim deed were fraudulent (Doc. 3-8 at 1–2, ¶ 7; *id.* at 3–5, ¶¶ 19, 21–28); accordingly, if the case had gone to trial, Reynolds was less likely to receive the award provided in the settlement agreement.  Reynolds's current attempts to enforce the superior court's March 2015 Order show that she well understood the benefits she gained from the settlement agreement and the court order.

In short, as with all of her claims, a reasonable juror could not conclude based on common knowledge and experience that Demas's conduct caused Reynolds harm.  Because Reynolds has failed to support her claims with expert testimony to establish an element of professional negligence, Reynolds's claims against Demas cannot survive summary judgment.

---

[8] In any case, the record does not support such an inference because, as discussed above, the record contains a copy of the settlement agreement and Reynolds does not dispute that she signed the settlement agreement.  (*See* Doc. 3-41; *see also* Doc. 3 at 20, ¶ 58.)

17

## III. Motion for Extension of Time to Retain Expert

Finally, Reynolds requests additional time to engage an expert witness. (Docs. 47, 65.) When the court sets a deadline and a party moves for additional time, the court may grant an extension of time "for good cause." Fed. R. Civ. P. 6(b)(1). However, when a party seeks an extension of time after the deadline has passed, the moving party must also demonstrate "excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). To determine whether the party's failure to act in a timely manner should be excused, the court considers: (1) the danger of prejudice to the opposing party; (2) the length of delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was in the reasonable control of the movant, and (4) whether the movant acted in good faith. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993). The Second Circuit has held that the reason for the delay, including whether it is within the reasonable control of the movant, is the most important factor, since the other three factors will often favor the movant. *See Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366 (2d Cir. 2003).

Here, Reynolds was required to disclose her expert witness by May 1, 2019. (Doc. 28), which she failed to do. Reynolds did not request an extension of time to retain an expert until July 2, 2019. (Doc. 47.) The Court therefore applies the "excusable neglect" standard to her motions.

The record shows that Reynolds has been seeking the services of an expert to support her claims since October 2017. (Doc. 35-6.) She did not request relief from

18

the expert witness requirement until six weeks after the deadline to disclose her expert had expired (Doc. 37); that request was denied. (Doc. 40.) She further failed to request an extension of time to find one until an additional two weeks after the Court denied her relief from the expert witness requirement and two months after the deadline had passed to submit her expert witness report. In sum, Reynolds has been seeking to retain an expert for nearly two years, yet has been unable to do so.[9] She now suggests that she has located an expert, but admits that she has not *secured* an expert and gives the Court no reasonable assurance that she will do so in a timely fashion. It is not clear to the Court that an extension of time would ensure prompt retention of an expert witness. Moreover, Defendants would clearly suffer prejudice if Plaintiff were permitted additional time to search for an expert after the close of the time for expert disclosure.

The Court thus finds that Reynolds had ample time in which to retain an expert and that additional time is not warranted. Reynolds has not demonstrated "good cause" to support her motions for an extension nor has she established "excusable neglect" for her failure to request it prior to the expiration of the May 1, 2019 deadline. Accordingly, Reynolds's motions for additional time (Docs. 47, 65) are DENIED.

---

[9] Although she asserts that the reason for her failure is her reliance on the common knowledge exception (Doc. 65 at 1), the Court denied her motion to rely on the exception on June 19, 2019. (Doc. 40.) At minimum, Reynolds has known for three months that she needed to retain an expert to support her claims.

## Conclusion

For the reasons set forth above, Demas and Baker's Motion for Summary Judgment (Doc. 30) is GRANTED, and Reynolds's motions for extension of time to retain an expert (Docs. 47, 65) are DENIED. Further, because the Court grants the Motion for Summary Judgment, the pending motions filed after the summary judgment motion are DENIED as moot. (Docs. 54, 56, 57.) Judgment shall be entered in favor of Defendants.

Dated at Burlington, in the District of Vermont, this 24th day of September 2019.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge